## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**WATY RYLAND,**

       **Petitioner,**

**vs.**

                                    **Case No. 4:08cv53-MP/WCS**

**WALTER A. McNEIL,**

       **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

This cause is before the court for ruling on an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 7. The petition was filed pro se. After an initial motion to dismiss, doc. 10, Respondent filed an answer. Doc. 15. The record was filed in paper form, but not scanned into the electronic docket. *See* doc. 15, pp. 39-40 (table of appendices A-DD) and docket entry 16 (reflecting receipt of the record). References to exhibits are to those supplied by Respondent unless otherwise noted.[1]

---

[1] Respondent refers to these as appendices (App.). The paper copies are marked as Exhibits. The court refers to them as exhibits (Ex.), and refers to appendixes (App.) for attachments to exhibits.

Petitioner submitted a motion to file a second amended petition, doc. 17, which was denied as not in proper form, and because it appeared that the claims were more in the nature of arguments which could be raised in reply to the answer. Doc. 19. Petitioner, still proceeding pro se, filed a reply. Doc. 21. A notice of appearance was filed by counsel for Petitioner, doc. 22, but counsel did not submit any argument.

**Motion to Dismiss**

Respondent filed a motion to dismiss. Doc. 10. I reviewed the motion, pointed out the problems with Respondent's argument, and directed Respondent to either supplement the motion or to file a response on the merits.[2] Doc. 12 (incorporated by reference). Respondent filed a response on the merits, noting the prior order but not raising any additional argument regarding timeliness. Doc. 15, p. 4. By failing to supplement the motion Respondent has waived the timeliness argument; to the extent it is not waived the motion should be denied for the reasons stated in document 12.

**State Procedural History**

Petitioner challenges the judgment of the Second Judicial Circuit, Leon County, in case number R99-1192A. Petitioner was represented by Leonard Holton. Jack Poitinger was the prosecutor.

---

[2] In the response on the merits, Respondent states that the original petition was filed in this case on February 4, 2008. Doc. 15, p. 3. But that was the contention that I found to be unsupported. In the initial petition, Petitioner stated under penalty of perjury that he delivered the petition to prison officials for mailing on January 28, 2008. Doc. 12, p. 3. It was timely filed if this was true. The burden was on Respondent under the "mailbox rule" to show that this was not the date the document was delivered by Petitioner for mailing, which is why the order gave Respondent the option of producing prison mail logs or other evidence. *Id.*, pp. 3-4.

The evidence at trial, as set forth in Petitioner's brief on direct appeal, Ex. F, pp. 3-14, was the following. On February 18, 1999, four men entered the Carlyle & Company jewelry store in the Tallahassee Mall, used a sledgehammer to smash open a glass display case containing Rolex watches, and fled with eight Rolex watches valued at $39,100. Lisa Malwitz, an employee with keys to the display cases, was standing behind the Rolex case when the men entered the store. Petitioner, Maurice Bell, Alexander Bell (cousin to Maurice[3]), Ricky Ryland,[4] and Freddie Rowell were charged with robbery with a deadly weapon. Petitioner had a jury trial along at the same time as codefendants Rowell and Maurice Bell, with Alexander Bell testifying for the State.

The five named defendants, along with Jacques Romulus, drove to Tallahassee from Miami the day before the robbery in a Ford Expedition which had been rented by the girlfriend of Maurice Bell. They spent the night in room 209 of a Days Inn in Tallahassee.

The plan was for Maurice Bell to drive a "spackled"[5] (stolen) Honda automobile to the Tallahassee Mall, and to wait for Alexander Bell, Petitioner, Ricky Ryland, and

---

[3] See Ex. D, p. 384 (Alexander Bell's testimony).

[4] Presumably Ricky Ryland was related to Petitioner Waty Ryland; Ricky Ryland was not on trial. See Ex. B, p. 57 (Holton's opening argument, noting Ricky Ryland was not on trial and asking the jury to keep them separate). Bell referred to Petitioner in his testimony as Deltron Ryland. See e.g., Ex. D, pp. 384, 386, 402 (identifying Deltron as the person wearing the hat).

[5] Alexander Bell testified that spackling is a term used when stealing a car; you remove the transmission and use a screwdriver or something small to start it. Ex. D, p. 392. In closing, the prosecutor noted the vehicle abandoned with the ignition "spackled," "which means this ain't mom's and dad's car, somebody stole this car," and argued that how could a person be unaware it was stolen "if you have got to use a screwdriver to start it?" Ex. E, p. 595.

Rowell to get the Rolex watches, which they had seen advertised on a billboard. They would proceed in the Honda to an Econo Lodge where Romulous was waiting with the Ford Expedition to drive back to Miami. Rowell carried the sledgehammer into the store, smashed the case with it two or three times. The others grabbed the watches and fled, leaving the sledgehammer behind. Store emplyees testified that the case was made of thick laminated glass. The entire incident took maybe 30 seconds. Employees offered no resistance. This was consistent with store policy, and they also said they felt afraid or discouraged from doing anything due to the smashing and flying glass. Petitioner was identified by one witness as a participant, but not as the person carrying the sledgehammer.

A witness observed four black males leaving the mall, all wearing coats, sunglasses, hats, and bandannas over their faces, with someone yelling for them to stop. They got into a car that had been waiting in the middle of the street by the mall entrance, and drove off quickly. The license number was given to police.

Police found a "spackled" Honda, still running, at the Econo Lodge about a half mile from the mall. Inside the car were watch holders, a screw driver, and a Florida map.

On February 19, 1999, Alexander and Maurice Bell, Ricky Ryland, and Romulus attempted to sell four Rolex watches to a jewelry store in Miami. The serial numbers matched watches taken from the Tallahassee Mall store.

The Ford Expedition was still in Maurice Bell's possession, and a search yielded a camera, straw hat, and gloves. Film in the camera was developed; one photo taken of Petitioner on February 18, 1999, the same day of the robbery, showed him wearing a

Rolex watch that appeared to be one that had been taken in the robbery and was never recovered. A key to room 209 of the Tallahassee Days Inn was found in Miami.

Alexander Bell testified that he did not have a formal deal with the prosecutor, but faced a life sentence and was hoping for something in exchange for his testimony.

Maurice Bell testified that he, Rowell, and Petitioner were asleep in the hotel at the time of the incident.

Petitioner was found guilty of robbery with a weapon (a lesser included offense of armed robbery with a deadly weapon), and sentenced to 30 years as a prison releasee reoffender. Ex. A, pp. 23-24 (verdict), 37-43 (judgment).

On direct appeal, the judgment was affirmed without opinion. Exs. F-H (briefs) and I (decision and mandate).

Petitioner filed a motion to correct illegal sentence pursuant to Fla.R.Crim.P. 3.800(a), which was summarily denied. Ex. P, pp. 119-122. No appeal was taken.

Petitioner filed a Fla.R.Crim.P. 3.850 motion. Ex. J, pp. 1-52. After a response and reply had been filed, the state court denied the motion, attaching relevant portions of the state court record. Ex. J, pp. 77-200 (the order itself is at pp. 77-85). Petitioner appealed, and the denial of relief was affirmed as to eight of the nine grounds raised in the Rule 3.850 motion. Ex. N.[6] The court reversed and remanded as to the claim of ineffective assistance of counsel for failure to file a notice of expiration of speedy trial time (ground seven in the Rule 3.850 motion), with directions that the trial court either attach portions of the record relevant to this claim or hold an evidentiary hearing. *Id.*

_____

[6] The opinion was published. Ryland v. State, 880 So. 2d 816 (Fla. 1st DCA 2004).

The opinion was filed on August 13, 2004, and the mandate issued on August 31, 2004. Exs. N and O.

Before the opinion and mandate were issued, Petitioner filed another Fla.R.Crim.P. 3.850 motion, and the court directed a response. Ex. R, pp. 401-439. Upon remand, counsel was appointed. *Id.*, pp. 442-443,pp. 457 (appointing Richard Greenberg as counsel).[7]

Hearings were held on October 20, 2005, and January 5, 2006. Exs. S and U (transcripts).[8] The court ultimately denied relief, attaching relevant portions of the state record. Ex. R, pp. 477-488 (the order itself is at pp. 477-481).[9] The court found that trial counsel's failure to file a notice of expiration of speedy trial was not ineffective assistance of counsel, crediting the testimony of counsel Leonard Holton that this was a complex case involving multiple defendants, and he needed additional time beyond the speedy trial period to prepare. *Id.*, pp. 477-479. The court also addressed the additional claim (raised before the hearing but not part of the remand) that the state used perjured testimony regarding whether the prosecution had a "deal" with co-defendant Alexander Bell. *Id.*, p. 480. The court found that "there was no deal," so the claim of knowing use of perjured testimony was not established. *Id.*

---

[7] Other attorneys were appointed and allowed to withdraw due to conflicts of interest. *Id.*, pp. 446-453.

[8] At the October hearing there was some confusion as to whether evidence was to be presented as to the remanded claim or the new claim regarding Alexander Bell (discussed *infra*). Ex. S, pp. 3-9. A brief hearing was held on November 8, 2005, setting the January hearing. Ex. T.

[9] The court also relied upon exhibits, listed at pp. 480-481, submitted at the evidentiary hearing.

Petitioner appealed, and the denial of relief was affirmed without opinion. Apps. V-X (briefs), Y and Z (order and mandate). Petitioner filed a petition for writ of certiorari, which was denied. Apps. AA-DD.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court. 28 U.S.C. §§ 2254(b)(1), (c)." O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). To properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented to the state courts." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (citing Picard).

If a claim was not fairly presented but is procedurally barred from further state court review,[10] Petitioner must demonstrate cause for the default and actual prejudice, or demonstrate that the constitutional violation has probably resulted in conviction of an innocent person. Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).

For claims that were properly exhausted and adjudicated in state court, this court's review is limited. "[A] determination of a factual issue made by a State court shall be presumed to be correct," and Petitioner has "the burden of rebutting the

---

[10] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available." The court therefore refers to "fairly presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default. See O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that

the adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute). Section 2254(d)(2) is

satisfied "only if it is shown by clear and convincing evidence that the state court's

presumptively correct factual findings do not enjoy support in the record." Lomholt v.

Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state

court's adjudication of the merits of the federal claim "resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States." § 2254(d)(1). "[C]learly

established Federal law, as determined by the Supreme Court of the United States,"

refers only to holdings (rather than *dicta*) of the Supreme Court, but decisions of lower

federal courts may be considered to the extent that they demonstrate how those courts

applied Supreme Court holdings. Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir.

2003) (citations omitted); Carey v. Musladin, 549 U.S. __, 127 S.Ct. 649, 653, 166

L.Ed.2d 482 (2006).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

independent meanings. Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495,

1519-1520, 146 L.Ed.2d 389 (2000); Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843,

1850, 152 L.Ed.2d 914 (2002) (citing Williams).

> Under the "contrary to" clause, a federal habeas court may grant the writ if
> the state court arrives at a conclusion opposite to that reached by [the
> Supreme] Court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable facts.
> Under the "unreasonable application" clause, a federal habeas court may
> grant the writ if the state court identifies the correct governing legal
> principle from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.  *See also*, Panetti v. Quarterman, __ U.S. __, 127 S.Ct. 2842, 2858-2859, 168 L.Ed.2d 662 (2007) (discussing the unreasonable application standard) (citing Williams, other citations omitted).

"Avoiding these pitfalls [described in Williams v. Taylor] does not require citation of our cases – indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002) (emphasis in original).  Further, "whether a state court's decision was unreasonable must be assessed in light of the record the court had before it."  Holland v. Jackson, 542 U.S. 649, 652, 124 S.Ct. 2736, 2738, 159 L.Ed.2d 683 (2004).

The basic law governing ineffective assistance of counsel claims was clearly established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066, 2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520; Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland, Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable

professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim,

"counsel is strongly presumed to have rendered adequate assistance and made all

significant decisions in the exercise of reasonable professional judgment."  466 U.S. at

690, 104 S.Ct. at 2066.  "[B]ecause counsel's conduct is presumed reasonable, for a

petitioner to show that the conduct was unreasonable, a petitioner must establish that

no competent counsel would have taken the action that his counsel did take."  Chandler

v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc), *cert. denied,* 531 U.S.

1204 (2001).  *See also* Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citing

Chandler).  There are no rigid requirements or absolute duty to investigate a particular

defense.  Fugate v. Head, 261 F.3d at 1217.

> Indeed, "[c]onsidering the realities of the courtroom, more is not always
> better.  Stacking defenses can hurt a case.  Good advocacy requires
> 'winnowing out' some arguments, witnesses, evidence, and so on, to
> stress others."

*Id.  See also* Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008) ("Because

this standard is objective, it matters not whether the challenged actions of counsel were

the product of a deliberate strategy or mere oversight.  The relevant question is not

what actually motivated counsel, but what reasonably could have motivated counsel.")

(citations omitted).  When the court "can conceive of a reasonable motivation for

counsel's actions," a claim of ineffective assistance should be denied without an

evidentiary hearing.  *Id.*, at 1302 (collecting cases).

For prejudice, Petitioner must show "a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although <u>Strickland</u> explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

A state court's adjudication of an ineffective assistance claim does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied <u>Strickland</u> differently.  <u>Williams</u>, 529 U.S. at 406, 120 S.Ct. at 1520; <u>Bell</u>, 535 U.S. at 698, 122 S.Ct. at 1852.

**Ground One, sufficiency of the evidence for robbery with a weapon**

Petitioner claims insufficiency of the evidence to support his conviction.  It is "an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979); <u>In re Winship</u>, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).  The federal due process issue is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis by the Court); <u>Fallada v. Dugger</u>, 819 F.2d

1564, 1570 (11th Cir. 1987). In other words, the petition may be granted "only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Machin v. Wainwright, 758 F.2d 1431, 1435 (11th Cir. 1985). The test is a limited one, and "[i]t is not required that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt." Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir.), *cert. denied*, 484 U.S. 925 (1987). "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief." *Id.* The sufficiency of the evidence must be determined with reference to the substantive elements of the offense as defined by state law. *Id.*; Machin, 758 F.2d at 1435, n. 2.

Petitioner contends there was insufficient evidence to support his conviction for robbery with a weapon under Fla. Stat. § 813.12(1), which requires that in the course of the taking there be "force, violence, assault, or putting in fear." Doc. 7, p. 4a (p. 5 in ECF).[11] Petitioner argues that "generic violence, of a degree no greater than necessary to wrongfully obtain jewelry from the store's laminated glass showcase, when witnessed by an employee" did not satisfy this element of the offense. *Id.* Petitioner claims there were two strikes of a sledgehammer to open the case, eight Rolex watches were taken, the robbers immediately left and abandoned the sledgehammer, and no force or violence was ever used against a jewelry store employee. *Id.*, pp. 4a-4b (pp. 5-6 in ECF).

Respondent contends that while Petitioner asserted this in support of his motion for judgment of acquittal and on appeal, he never raised it as a federal due process

---

[11] Sufficiency of the evidence with respect to the weapon element is addressed in ground two.

claim, and is now procedurally barred from raising the federal claim in state court. Doc. 15, pp. 5-7. Respondent also argues that the claim lacks merit. *Id.*, pp. 7-9.

Petitioner replies that the claim was properly exhausted, as the standard for sufficiency of the evidence is the same under Florida and federal law. Doc. 21, pp. 2-3, *citing* Mulinix v. Secretary for the Department of Corrections, 254 Fed. Appx. 763 (11th Cir. November 17, 2007). The court there said:

> Florida courts assess the sufficiency of the evidence used to convict criminal defendants under a legal standard identical to the one used by federal courts in deciding federal due process challenges to the sufficiency of the evidence. In assessing the sufficiency of the evidence, Florida courts review whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. This is identical to the federal standard for reviewing due process challenges based on the sufficiency of the evidence, as set forth in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (standard is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

254 Fed. Appx. at 764. While "[t]he Supreme Court has made clear that a prisoner does not exhaust federal claims merely by raising similar state claims," there it was found that the "state and federal claims were not merely similar: they were identical." *Id.*, at 764-765.

In another unpublished case, however, the Eleventh Circuit said that, "[a]lthough Florida courts assess the sufficiency of the evidence under the standard applied in [Jackson v. Virginia], the basis of Pearson's argument was that there was no evidence of reasonable fear on the part of the victim, as defined by state law. Nothing in this argument would have alerted the state court to the presence of a federal claim about due process," so the federal claim was not exhausted. Pearson v. Secretary,

Department of Corrections, 273 Fed. Appx. 847, 850 (11th Cir. April 15, 2008).[12]

"Exhaustion is not satisfied 'merely' if the petitioner presents the state court with 'all the

facts necessary to support the claim' or even if a 'somewhat similar state-law claim was

made.' " at 850, *quoting* Kelley v. Sec'y for Dept. of Corr., 377 F.3d 1317, 1344 (11th

Cir. 2004).  "The petitioner must instead present his claims to the state courts such that

they are permitted the opportunity to apply controlling legal principles to the facts

bearing upon his constitutional claim."  273 Fed. Appx. at 850 (internal quotations

omitted), *quoting* Kelley (which was quoting Picard v. Connor).

Petitioner claims that under Florida law, there must have been resistance by the

victim, resistence which was overcome by force from the offender, and if no force is

used, there must be proof that the victim was placed in fear of death or great bodily

harm.  Doc. 21, pp. 4-6, *citing*, Robinson v. State, 692 So. 2d 883, 885 (Fla. 1997).

Petitioner asserts that this is an objective test, of whether a reasonable person would

have felt sufficiently threatened.  *Id.* at p. 4, citing, Magnotti v. State, 842 So. 2d 963

(Fla. 4th DCA 2003).  As the question on appeal was summarized in the appellate brief:

"[I]s a 'smash and grab' theft occurring in an open jewelry store, where the culprits

intend no violence to persons and commit no actual violence against them, elevated to

the crime of robbery because a sledgehammer is used as a tool?"  Ex. F, p. 15.

Whether defaulted or not, Petitioner is not entitled to relief on this claim.  "To

establish robbery, the taking must be by means of:  (1) force or violence; or (2)

---

[12] In Pearson, the state acknowledged Mulinix but "asserts that the state and
federal standards are not identical in the instant case.  The state further disputes that it
is sufficient to raise a federal claim by discussing only state law even if the state and
federal law are identical."  Id. at 849, n. 3.

intimidation by assault or putting in fear."  Robinson, 692 So. 2d at 886 (citations

omitted).  There the court was looking at a Georgia conviction for robbery by sudden

snatching, to determine whether it would qualify as robbery under Florida law (and thus

as a qualifying offense) for habitual offender sentencing.  It pointed out that it was only

concerned with the first way that robbery could be committed, "by force and violence,"

and did not consider the second way, by "intimidation."  692 So. 2d at 886.  It was

determined that in Florida, "in order for the snatching of property from another to

amount to robbery, the perpetrator must employ more than the force necessary to

remove the property from the person.  Rather, there must be resistance by the victim

that is overcome by the physical force of the offender," such that "[t]he snatching or

grabbing of property without such resistance by the victim amounts to theft rather than

robbery."  692 So. 2d at 887 (citations omitted).[13]

        Magnotti, on the other hand, considered the second alternative, commission of a

robbery by placing another person in fear.  842 So. 2d at 964.  The court rejected the

argument that a reasonable person would not have been placed in fear of harm, where

the person came into a bank and said "this is a hold-up" but no weapon was observed

and the bank teller was behind a bullet-proof window.  *Id.*  The court reasoned:  "[N]ot

only did the victim testify that she was afraid, but the circumstances of the crime were

---

[13] Petitioner also claims  a "smash and grab" of a jewelry store is grand theft, as
in Hardie v. State, 513 So. 2d 791 (Fla. 4th DCA 1987).  That case is inapposite.  There
a "smash and grab" of a jewelry store, during store hours, was prosecuted as a grand
theft.  But no issue was raised as to whether it *could* have been robbery, and no facts
surrounding the theft (such as how it was effected, whether it was inside the store or
outside, from, for example, a display window) are provided in the opinion, which
concerned admission of  the testimony of five police officers, identifying the appellant as
the person in a surveillance video of the theft.

also such that the jury could conclude that fear of death or great bodily harm under the

circumstances was objectively justifiable." 842 So. 2d at 965. The court said:

> The rule in this regard is that if the circumstances attendant to the robbery
> were such as to *ordinarily induce fear in the mind of a reasonable person*,
> then the victim may be found to be in fear for the purpose of the robbery
> statute, and *actual fear need not be proved*. Thus, the controlling factor is
> not necessarily the victim's subjective state of mind, but whether a jury
> could conclude that a reasonable person, under like circumstances, would
> have felt sufficiently threatened to accede to the robber's demands.

*Id.* (citations omitted, emphasis added). The court noted that a bank is generally known

to take extraordinary security precautions, but there is much at stake given large

amounts of cash on the premises, and thought that:

> a *reasonable person* could fear that someone brazen enough to plan and
> execute a daylight theft from a bank, at the risk of severe or even fatal
> injury, would have armed himself in advance. Thus, in this case, the fact
> that the perpetrator did not openly display a weapon was not as important
> as the teller's inability to discern that he did not possess one.

*Id.*, (emphasis added), *quoting* State v. Baldwin, 709 So. 2d 636, 638 (Fla. 2d DCA

1998). The court also said: "We believe that the jury could conclude that the prospect

of putting a presumed bullet-proof glass shield to the test by standing behind it when a

gun is fired would ordinarily place a reasonable person in fear." *Id.*

The jury in Petitioner's case was instructed that for robbery:

> The taking must be by the use of force or violence or by assault so as to
> overcome the resistance of the victim or by putting the victim in fear so
> that he or she does not resist.

> The law does not require that the victim of robbery resist to any particular
> extent or that the victim offer any actual physical resistance if the
> circumstances are such that the victim is placed in fear of death or great
> bodily harm if he or she does resist.

> But, *unless prevented by fear*, there must be some resistance to make the
> taking one by force or violence.

Ex. E, pp. 641-642 (emphasis added). The jury was instructed on the lesser included offense of grand theft. Ex. E, pp. 644-645.

Given the instructions, the jury must have found that the victim was placed in fear of death or great bodily injury if she offered any resistance. A reasonable trier of fact could have made this finding beyond a reasonable doubt based on the evidence, including the statement of Malwitz that she was afraid. *See also* Ex. E, pp. 593, 610 (closing argument of the State, telling the jurors to watch the video and decide for themselves if Malwitz reacted as she did out of fear). Her fear was objectively reasonable.[14] This was not a case of snatching merchandise from an open counter. This crime was committed by four men in an open mall. One of the men twice swung a sledgehammer against a jewelry case and smashed it. The property in the case was quite valuable, and the store clerk had a duty to protect this valuable property. This sudden violence was a plain signal to a reasonable store clerk that the man with the sledgehammer had a firm resolve to take property from the jewelry case by violence, and would use the same violence had she tried to stop or impede him. A sledgehammer employed in such an intentionally violent manner is fully capable of inflicting death or serious bodily harm.[15]

---

[14] As discussed above, the critical issue is whether a reasonable person would have been afraid; actual fear of the victim need not be shown. <u>Magnotti</u>, 842 So. 2d at 965. The fear of the victim here was merely evidence to support a conclusion that an objectively reasonable person would have been afraid.

[15] *See also* Ex. E, pp. 594, 610-611 (closing argument by the State, asserting that the people who did this were brazen).

Consequently, Petitioner has not established that there was insufficient evidence in violation of due process, and – assuming the due process claim was properly presented to the state court – he cannot show that the state court's adjudication of this claim was contrary to or an unreasonable application of clearly established federal law. Ground one affords no relief.

**Ground Two, sufficiency of evidence for enhancement for use of a weapon**

This is a secondary part of ground one. Petitioner asserts insufficiency of the evidence to sustain the enhancement for use of a weapon during the robbery, as the sledgehammer was not shown to be a weapon for purposes of Fla. Stat. § 790.001. Doc. 7, pp. 4 and 4c (pp. 5 and 7 in ECF). In his response, Petitioner shifts and refines his claim. Petitioner argues that he was originally charged with robbery with a *deadly* weapon, but was found guilty of the lesser offense of robbery with a weapon. Doc. 21, p. 9. Petitioner argues that pursuant to Fla. Stat. § 790.001(13), a "weapon" is defined as: "any dirk, knife, metallic knuckles, slungshot, billie, tear gas gun, chemical weapon or device, *or other deadly weapon* except a firearm or a common pocketknife, plastic knife, or blunt-bladed table knife." Doc. 21, p. 9 (emphasis added). He argues, therefore, that since a sledgehammer is not listed, it can be a "weapon" only if it was a "deadly weapon." *Id.* He argues that in light of the jury verdict, Respondent is now estopped to argue that the sledgehammer was a *deadly* weapon. *Id.*, p. 10. Since it was not a deadly weapon, reasons Petitioner, it was not a weapon at all.

Respondent asserts the same basis for procedural bar as raised in response to ground one, and argues that whether a sledgehammer is a weapon for purposes of the statute is purely a matter of state law, not cognizable in this court. Doc. 15, pp. 9-10.

Respondent also argues that the evidence was legally sufficient to support use of a

deadly weapon. *Id.*, p. 10.

Petitioner incorporates his defense to the procedural bar as to ground one, again

citing <u>Mulinix</u>.  Doc. 21, p. 8.  The court addresses the claim on the merits as it did for

ground one.

The trial court's instructions on this subject are the following:

> Now, a weapon is a *deadly weapon* if it *is used or threatened to be used* in
> a way likely to produce death or great bodily harm.

> And a *weapon* is legally defined to mean any object that *could be used* to
> cause death or inflict serious bodily harm.

Ex. E, p. 643 (emphasis added).

For purposes of the robbery, therefore, a "weapon" is any object that *could be*

used to cause death or inflict serious bodily harm, and the question is one of fact for the

jury.  <u>Dale v. State</u>, 703 So.2d 1045 (1997).

> Subsection (2)(b) of the robbery statute addresses offenders who, in the
> course of committing the robbery, carried a "weapon."  "Florida courts
> have generally utilized the statutory definition of 'weapon' provided in
> section 790.001(13) to determine whether a particular object constitutes a
> 'weapon' for purposes of section 812.13(2)(b)."  A box cutter/razor knife is
> not among the specifically enumerated items in section 790.001(13),
> Florida Statutes (2001), which defines "weapon" as "any dirk, metallic
> knuckles, slingshot, billie, tear gas gun, chemical weapon or device, or
> other deadly weapon except a firearm or a common pocketknife."  As used
> in this statute, "other deadly weapon" has been defined by the courts to
> mean either 1) an "instrument which will likely cause death or great bodily
> harm when used in the ordinary and usual manner contemplated by its
> design and construction," or *2) "an object which is used or threatened to
> be used during a crime in such a way that it would be likely to cause death
> or great bodily harm."*  "An object can become a deadly weapon if its sole
> modern use is to cause great bodily harm." . . .  *The other way an object
> can be construed as a "deadly weapon" is its particular use, or threatened
> use, during the crime. . . .*  Because the State presented no evidence that
> the object was used, or threatened to be used, as a weapon, the trial court

reversibly erred in denying the motion for JOA insofar as it related to any offense greater than unarmed robbery.

Holley v. State, 877 So.2d 893, 896-897 (Fla. 1st DCA 2004) (citations omitted,

emphasis added).

It is true that no threat was spoken during the commission of this crime. But to

determine whether this sledgehammer was a "weapon," the jury had to consider

whether it "*could be used* to cause death or inflict serious bodily harm." In making that

determination, it could consider the way the sledgehammer was used during this crime.

Holley v. State, *supra.* The sledgehammer was used here with great violence, in the

immediate presence of the clerk. The four men walked into the mall jewelry store with

their faces covered, and one of them repeatedly beat the jewelry case with the

sledgehammer until it loudly shattered. A reasonable juror could find that this

sledgehammer was an "object that *could be used* to cause death or inflict serious bodily

harm." Petitioner is not entitled to relief on this claim as he has not shown a due

process violation, or that the state court's adjudication was contrary to or an

unreasonable application of clearly established federal law.

**Ground Three, ineffectiveness relating to a juror**

Petitioner asserts ineffective assistance of counsel for failing to challenge an

allegedly biased juror, who knew one of the prosecution witnesses and "decided

Petitioner's guilt." Doc. 7, p. 5 (p. 8 in ECF). He alleges that during jury selection all the

jurors represented that they did not recognize the names of any state witnesses, then

during trial one witness told the bailiff she recognized a juror, and yet counsel did not

move for further inquiry. *Id.*, p. 5a (p. 9 in ECF). Petitioner claims this showed that one

juror was untruthful, by answering that none of the names looked familiar, so counsel

should have moved to reopen *voir dire*. *Id.*, p. 5b (p. 10 in ECF). Petitioner asserts that

this claim was raised in grounds 1 and 2a of his Rule 3.850 motion. *Id.*

     Respondent agrees that this was raised as grounds 1 and 2a of the Rule 3.850

motion, referencing the amended § 2254 petition. Doc. 15, p. 11. Respondent

contends that the state court denied claim one of the Rule 3.850 motion as an issue to

be raised on direct appeal, and that this claim is, therefore, procedurally barred. *Id*, p.

11, referencing Ex. J, pp. 77-78. Respondent notes that this was raised as an

ineffective assistance of counsel claim in issue 2a of the Rule 3.850 motion, and argues

the claim is without factual basis. *Id.*, pp. 12-17.

     Respondent claims that the record only shows that the court noted, just before

the jury was sworn, that the bailiff advised: "[w]ell, what the bailiff has advised me is

that Karen Dyke[16] said that when <u>she</u> was talking informally, one of the witnesses

<u>thought</u> <u>she</u> recognized one of the jurors." Doc. 15 p. 12, *quoting* Ex. B, p. 32 with

added emphasis. The trial court thought that this information was insignificant, the

prosecutor agreed, and none of the defense attorneys commented. Petitioner relies on

speculation, it is argued, in stating that the witness recognized a juror, that this indicated

an acquaintance between the two, and (in his state pleading) further speculated that the

witness was Malwitz, the person closest to the smashed display case, as opposed to

Hatfield, who worked in the customer service booth of the mall and might have been

seemed "familiar" to many people. *Id.*, pp. 13-15. Respondent also notes that three

---

[16] *See* Ex. J, p. 78 (order denying Rule 3.850 motion) (referring to Karen Dyke as
a courthouse employee).

defendants were on trial together, and none of the defense attorneys reacted to this, strongly implying that it was inconsequential, as treated by the trial court. *Id.*, pp. 16-17.

Petitioner presents no additional argument in reply. Doc 21, p. 12.

Petitioner has not identified the juror or the witness. His assumption as to which witness it might have been is purely speculative. His claim that the unidentified juror lied or was biased is also speculative. That a witness thought one of the jurors looked familiar does not contradict the juror's claimed lack of recognition of the *names* of any witnesses. Indeed, after noting what the bailiff advised, the court said, "my gut reaction on that is, that's not significant. What is significant is, did one of the jurors recognize the name of any of the witnesses. So my reaction is, that's that." Ex. B, pp. 32-33.

A person may appear to be familiar because the person has been seen before or may resemble someone else. Superficial familiarity with a face, posture, or style of dress does not show friendship, bias, or even mere acquaintance. Moreover, whether to question or challenge a juror is a matter of trial strategy as to which the court should accord particular deference. *See* Miller v. Francis, 269 F.3d 609, 615-616 (6th Cir. 2001) (citing Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001) (other citations omitted); Gardner v. Ozmint, 511 F.3d 420, 426 (4th Cir. 2007), *pet. for cert. filed* May 29, 2008 (also citing Hughes). *See also*, Cage v. McCaughtry, 305 F.3d 625, 626-627 (7th Cir. 2002) (counsel may decide not to challenge a juror for cause believing "on balance the juror was more likely to vote for than against his client," and whether counsel's reasoning for keeping the juror was "[c]orrect or not, this is the kind of reasoning that a criminal defendant wants his lawyer to engage in.") .

As Petitioner has not identified the juror, he cannot show prejudice (*i.e.*, the seating of a biased or prejudiced juror) resulting from counsel's failure to pursue the issue. Gardner, 511 F.3d at 426 (citation and footnote omitted). *See also* Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007) (holding that where defendant claims ineffective assistance of counsel for failing to raise or preserve a cause challenge to a prospective juror, he must show that the juror was actually biased). As the state court noted, there was "no proof in the court record, nor is there any proof of evidence to this day, that any juror knew any witness," and the court found no error of counsel or prejudice to the outcome. Ex. J, pp. 78-79. This was not an unreasonable determination of the facts in light of the evidence presented, or a decision contrary to or an unreasonable application of clearly established federal law. This ground affords no relief.

**Ground Four, ineffectiveness relating to speedy trial**

Petitioner asserts ineffectiveness of trial counsel for failing to seek discharge on speedy trial grounds. Doc. 7, p. 5 (p. 8 in ECF). He alleges that the speedy trial time expired on October 15, 1999, and "[t]his failure to notice the court of the expiration of speedy trial time allowed the state to broker an agreement with co-defendant Alexander Bell for testimony against Petitioner's interest." *Id.*, pp. 5c-5d (pp. 11-12 in ECF).

Petitioner notes that the state court (in the Rule 3.850 proceeding) found counsel was not prepared for trial on October 15, 1999, that his failure to demand a speedy trial was tactical, and concluded that "[b]ecause the State court failed to address [his] argument that counsel was ineffective for failing to file a notice of expiration of speedy trial, after 175 days expired, the State Court unreasonably applied the clearly established federal law." *Id.*, p. 5d (p. 12 in ECF).

Respondent concurs that "[t]his is the issue remanded on Ryland's first appeal from (summary) denial of postconviction relief," but argues that it was solely presented as a violation of the state speedy trial rule, so "counsel at most was ineffective as to a state-level right." Doc. 15, pp. 17-19. Respondent argues that this is an issue of state law not cognizable here, and if "somehow" construed to raise a federal claim then the "failure to assert a federal claim in the state courts renders this ground procedurally barred." *Id.*, pp. 19-20. Respondent also contends that the claim lacks merit, relying on the brief filed in the post conviction appeal and the state court's findings of fact. *Id.*, pp. 20-21, incorporating Ex. W, pp. 28-42 and Ex. R, pp. 478-479.

The first argument is fundamentally flawed. Petitioner is not presenting the alleged state law speedy trial violation as an independent claim. He is claiming that he received ineffective assistance in violation of the Sixth Amendment right to counsel with respect to how counsel handled the state law speedy trial issue.[17] *See* Kimmelman v.

---

[17] Respondent references <u>Allen v. Department of Corrections</u>, 288 Fed.Appx. 643 (11th Cir. 2008), which is does not support the argument. The claim on appeal there was that the district court should have construed Claim 21, asserting ineffectiveness based on cumulative errors of counsel, **as also** raising a speedy trial claim. 288 Fed.Appx. at 644 (noting the district court rejected the individual and cumulative ineffectiveness claims). The issue was "[w]hether the district court erred by failing to construe Allen's argument regarding counsel's cumulative errors as one raising a speedy trial claim, and if so, whether the district court failed to analyze that claim in light of <u>Clisby v. Jones</u>, 960 F.2d 925, 936 (11th Cir. 1992) (*en banc*)." *Id.* <u>Clisby</u> requires the district courts to resolve all asserted habeas claims in order to avoid "piecemeal litigation" of petitions. *Id.*, *quoting* <u>Clisby</u>. The Eleventh Circuit found no error under <u>Clisby</u>: "[f]irst, Claim 21 is an ineffective assistance of trial counsel claim," and **even if construed as a speedy trial claim**, it "at best raises only a *state law* speedy trial claim and not a *federal* speedy trial claim. 288 Fed.Appx. At 644-645. This does not support Respondent's contention that, like Allen, "Ryland's ineffectiveness claim in state court never raised a <u>federal</u> speedy trial violation," and even if "it is assumed counsel ineffectively failed to seek discharge" under the state rule, then "counsel at most was ineffective as to a state-level right." Doc. 15, pp. 18-19. If this case is analogous, it is in

Morrison, 477 U.S. 365, 374-379 and n. 1, 106 S.Ct. 2574, 2582-85, 91 L.Ed.2d 305 (1986) (distinguishing Fourth Amendment claim, which may not be litigated under § 2254 and was defaulted, with ineffective assistance of counsel for failure to litigate a Fourth Amendment claim; "Sixth Amendment claim is distinct from his Fourth Amendment claim and has never been defaulted"); Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir.1984), *cert. denied*, 469 U.S. 956 (984)[18] (in the context of alleged ineffectiveness of appellate counsel, "[o]n the one hand, the issue of ineffective assistance – *even when based on the failure of counsel to raise a state law claim* – is one of constitutional dimension," but, "[o]n the other hand, the validity of the claim [counsel] failed to assert is clearly a question of state law, and we must defer to the state's construction of its own law.") (emphasis added, citations omitted). *See also*, Callahan v. Campbell, 427 F.3d 897, 931 -932 (11th Cir. 2005) (in ruling on ineffectiveness claim, state court determined that the objection counsel failed to make would have been overruled as a matter of state law; the state court therefore "already answered the question of what would have happened had [counsel] objected," so petitioner could not show deficient performance or prejudice), *following* Herring v.

---

the sense that this court need not construe the ineffectiveness claim as also raising a federal speedy trial claim which, in turn, must be reviewed under Clisby.

[18] Alvord was superseded by statute on other grounds as noted in Hargrove v. Solomon, 227 Fed. Appx. 806 (11th Cir. 2007); *see also* United States v. Battle, 264 F.Supp.2d 1088, 1134-35 (N.D. Ga. 2003) (noting that Alvord, involving a claim of ineffectiveness for failure to raise an insanity defense, predated passage of the Insanity Defense Reform Act of 1984).

<u>Secretary, Department of Corrections</u>, 397 F.3d 1338, 1354-55 (other citations omitted).[19]

A valid state speedy trial claim would be but one element in proving the ineffective assistance of counsel claim. <u>Kimmelman</u>, 477 U.S. at 375, 381-382, 106 S.Ct. at 2573, 2586 -2587 (valid Fourth Amendment claim was necessary, but not enough, to show ineffectiveness for failing to file motion to suppress). In Florida, counsel may waive the Florida time limits even against his client's wishes. <u>Randall v. State</u>, 938 So. 2d 542, 544 (Fla. 1st DCA 2006) (collecting cases). *See also*, <u>Taylor v. State</u>, 557 So. 2d 138, 141-142 (Fla. 1st DCA 1990) (noting tension between right to speedy trial under state statute and constitutional right to competent, prepared counsel; finding no violation of the constitutional right to speedy trial where counsel sought a continuance over defendant's objections), *overruled on other grounds*,[20] and <u>Jones v. State</u>, 449 So. 2d 253, 262 (Fla.), *cert. denied*, 469 U.S. 893 (1984) (defendant may not control the docket by making spurious demands for a speedy trial he is not prepared for, citations omitted). *See also* <u>Vermont v. Brillon</u>, 556 U.S. __, 129 S.Ct. 1283, 173 L.Ed.2d 231 (2009) (in context of federal speedy trial, assigned counsel is the agent of defendant and not a state actor, so counsel's delays are usually attributable to the client).

---

[19] The court noted that the "argument that the state court unreasonably applied *Strickland* [under § 2254(d)(1)] obviously depends upon our determining [counsel's] performance was deficient, but first we would have to conclude the state court misinterpreted state law . . . ." 427 F.3d at 932.

[20] <u>Taylor</u> was disapproved to the extent inconsistent with the opinion in <u>Heuss v. State</u>, 687 So. 2d 823 (Fla. 1996) (holding that state's failure to argue harmless error does not preclude appellate court from considering it).

The state court rejected the ineffectiveness claim, noting that a notice of expiration of speedy trial would not result in immediate discharge, but in the setting of trial. Ex. R, pp. 477-478. The court found that Holton, a credible witness, said that this was a complex trial with multiple defendants, and he was not ready to go to trial within the time demanded by Petitioner. *Id.*, p. 478. The court found that the reasons for a delay of less that one year from first appearance to trial, including investigating, locating and deposing witnesses, were all reasonable. *Id.* The court rejected Petitioner's claim of prejudice, that the delay allowed Alexander Bell to broker a deal with the prosecution. The court found that there was no deal and no evidence that Bell would not have testified even if the case had been tried sooner. *Id.*, pp. 478-479. The court found that counsel was reasonable "in preparing this case for trial and by his decision not to press for a trial date until he was ready." *Id.* The court also rejected Petitioner's assertion that if he had demanded an earlier trial, he would have been tried separately from his codefendants. *Id.* The court reasoned that being prepared for trial "is a reasonable attorney decision whether or not defendant ends up being tried alone or with co-defendants," and the question of who would have been tried together at an earlier trial was "sheer speculation." *Id.*

Petitioner has not shown that this was an unreasonable determination of the facts, or contrary to or an unreasonable application of clearly established federal law, and is not entitled to relief on this ineffective assistance of counsel claim. Ground four affords no relief.

**Ground Five, the allegedly perjured testimony of Alexander Bell**

Petitioner asserts that his conviction was obtained by knowing admission of the perjured testimony of Alexander Bell (or Bell; references to his cousin, the other defendant Bell, are to Maurice Bell). Doc. 7, pp. 6-6b (pp. 13-15 in ECF). Petitioner asserts that the state court's denial of this objection following a hearing, which was affirmed on appeal, finding no deal between the State and Bell and no perjured testimony, was contrary to clearly established federal law and an unreasonable determination of the facts in light of the evidence presented. *Id.*, p. 6b (p. 15 in ECF). Further, argues Petitioner:

> To deny petitioner[']s post conviction claim on the basis that Alexander Bell's post trial recantations was not creditable and then bring perjury charges to Alexander Bell for not truthfully testifying at the May 11th 2000 trial was an unreasonable determination of the facts in light of the evidence presented.

*Id.*

Respondent responds to this claim on the merits, but notes that the claim raised in Petitioner's petition for writ of certiorari (following the appellate decision affirming the denial of Rule 3.850 relief) was that the state used contradictory theories to obtain convictions, whereas he had argued below (and argues here) that his conviction was based on perjury in violation of due process. Doc. 15, pp. 23-24. Respondent incorporates by reference the procedural and factual statement set forth in the response to Petitioner's petition for writ of certiorari. *Id.*, p. 23, incorporating Ex. BB, pp. 2-8.

In reply, Petitioner reiterates his claim is "that he was denied a fair trial when a state's witness, Alexander Bell, testified before the jury that he was not promised anything in return for his testimony implicating petitioner, when in fact he did receive a

promise of consideration."  Doc. 21, p. 13.  Petitioner asserts that the fact Bell was told

there would be consideration of leniency rather than a guarantee of leniency "is of *no*

*effect.  It remains that Bell was given an *incentive* to testify falsely, and that fact was

unlawfully kept from the jury."  *Id.*, p. 14 (emphasis in original).

The claim that the jury was not made aware of Bell's incentive to testify is

squarely contradicted by the record.  At trial, Bell testified that he was also charged in

this case, that his attorney was Cheryl Gentry, and he gave his statement to her

knowing it would not be used against him but would be provided to the state attorney for

use against the other people charged.  Ex. D, pp. 409-410 (direct), 414-416 (cross

examination by Holton).  On cross examination Holton brought out that Bell had

reviewed the police reports and other materials before he gave his statement to Gentry,

and he had looked through the documents "[a] lot."  *Id.*, pp. 415-416.   In his cross

examination, Mr. Rand (counsel for Maurice Bell) used the term "deal," and the

prosecutor objected because there was no evidence of a deal.  *Id.*, p. 430.  The

objection was overruled.  *Id.*, p. 431.  Bell admitted that he had repeated conversations

with Gentry about what to do in his case, what could happen to him, and that he could

get a life sentence.  *Id.*, pp. 431-432.  He said that Gentry told him that he could help

himself by testifying against the others, and that was why he was testifying, to help

himself.  *Id.*, p. 432.

The court then explained that the court was not allowed to comment on evidence,

and reasoned that despite "the rather ambiguous 'ruling' that the Court made responsive

to the objection made by the State, whether there's a deal or not, that's your decision,

not mine." *Id.*, pp. 432-433.  Bell denied that he ever told his lawyer he would not testify

or told Maurice Bell's girlfriend that he expected to get probation.  *Id.*, pp. 434-435.

On cross examination by Mr. Greenberg (counsel for Freddie Rowell), Bell said

that Gentry had been in the court room earlier, as she needed to know everything he did

to help the prosecution.  *Id.*, pp. 435-436.  On redirect, Bell said he was told only by

Gentry, not the prosecutor, that his statement would not be used against him.  *Id.*, p.

446.  He said the prosecutor never used the word "deal."  *Id.*, p. 448.

In his closing, counsel for Petitioner argued as to Bell:

[D]oes the witness have some interest in how this case should be
decided?  Well, I don't think there's any question at all that Alexander Bell
has a monumental interest in how this case is decided.  He told you so
himself.  He even admitted whenever Mr. Poitinger asked him that
question.

Mr. Poitinger said, I never talked to you about a deal.  Mr. Poitinger even
objected to the use of the word "deal."  It would seem to me that rather
than diminishing the possibility that he has a motivation to falsify, I think it
increases it.  And here's why.  If there were a specific agreement, if there
were a deal that was cut, then you know what you have to face.  But, if
there's not a deal, if you are doing it open-endedly, if Alexander Bell is
saying, boy, I sure hope this works out for me, is he going to try harder
under those circumstances than if he already knows what he will get in
return for it? . . .

He openly admitted he is testifying to get a better deal.  He gave a
statement to his attorney.  He admitted that the attorney told him they are
not going to use this against you, they are going to use it against other
people, and that he had an opportunity to look at the reports.

*Id.*, pp. 557-558.

Counsel argued that if the jury found Bell had an interest in this case, then there

was a reasonable doubt.  *Id.*, p. 563.  After the Government's closing argument, Holton

again reminded the jury "that he [Bell] has something at stake in this case."  *Id.*, p. 624.

Mr. Rand argued in closing that Bell had a "deal," and the prosecutor again

objected to use of that word. *Id.*, pp. 570. The court again said it could not comment on

the evidence, as "[t]hat's the province of the jury." *Id.*, p. 571. Rand continued:

> And it is your province. It is your province to determine if the word "deal"
> is appropriate. And when Alexander Bell is telling you that I know that I'm
> in deep trouble and I'm looking at life in prison and if I don't do something
> for this man to help me, then I'm going for life. And so what's he looking
> for? He is looking for a deal. And he knows that he has got to help
> himself somehow. And what does he do? He turns on his cousin and his
> friends and tells the State those are the guys.

*Id.* Rand argued that Romulus Jacques was also involved, and testified, but did not get

charged, and concluded: "[s]o what do you think the expectation is for Alexander Bell?"

*Id.,* pp. 571-572.

Mr. Greenberg argued that Bell's testimony was the only evidence linking his

client (Rowell) to this case, but "you have to consider the testimony of Mr. Bell with

great caution. He is hoping that something good is going to happen to him for all the

testimony that he has given." *Id.*, pp. 583-584. He said Bell "is being the yes man to

the man that he knows has some control over what's going to happen to him later." *Id.*,

p. 584. After the prosecutor's closing argument, Greenberg again reminded the jury

that Bell was doing this hoping for something in return. *Id.*, p. 637.

The prosecutor argued that the defense attorneys were trying to convince the

jury that Bell could not be believed just because he was actually there, but they had to

attack Bell because he was testifying against their clients. *Id.*, pp. 603-606.

On July 17, 2003, after trial, Bell gave a sworn statement before a court reporter

in support of a post conviction motion filed by Maurice Bell. App. B to Ex. BB. Bell said

he had been on probation (for this offense) but had completed probation. *Id.*, p. 416.

He said Gentry had come to him with the deal from the prosecutor, and told him he should "come clean now while this deal is still on the table." *Id.*, p. 417. She told him the deal was that he would testify, and get two years credit for time served and two years probation. *Id.*, p. 418. Otherwise he would get life in prison, so he accepted the deal. *Id.* He said that they told him they could not give him "the deal now because it would incriminate them some type of way," and "so they told me to wait until after the trial," when he "would get my deal." *Id.*, p. 419. At that point Bell had already been in jail two years. *Id.*

Bell testified that he wanted to bring it to the judge's attention at trial that he was offered a specific deal, but the prosecutor told him that if he did they had a "backup plan" to have someone else testify. *Id.*, pp. 420-421. He felt that if he did not testify as they told him to, he would get life. *Id.*, p. 421. He said that Gentry's apparent out of court statement to counsel that there was no deal was a lie. *Id.*, p. 423. He said they took care of him and transferred him to Wakulla County when he decided to cooperate, and brought food and things to him at the jail. *Id.*, p. 424. The deal had changed from something like fifteen years to five years to two years, and he did not want to testify against his family and friends, but Gentry told him he would either "be the flipper or the flippee." *Id.*, pp. 425-426. Bell said he was fully prepared to so testify at a hearing, because it was the truth and he was upset by what happened at trial. *Id.*, pp. 427-428, 430.

Bell testified at a post conviction hearing for Maurice Bell on October 9, 2003, though the court cannot locate the transcript in this file. It is assumed that he testified similarly to his sworn statement given on July 17, 2003. On October 9, 2003, Bell was

charged with perjury.  App. C to Ex. BB.  At the October hearing he "did in fact admit to making false statements under oath during two previous official proceedings," on December 16, 1999 (prior to Petitioner's trial), and when he testified at trial on May 11, 2000.  *Id.*  In both prior proceedings he said he was not offered a plea agreement, but then in Maurice Bell's proceeding he "testified under oath that he had in fact been offered a specific plea arrangement in exchange for his testimony against Maurice Bell.  Alexander Bell then admitted under oath that he had intentionally made a false statement during the May 11, 2000 trial."  *Id.*

Bell was called to testify at this Petitioner's Rule 3.850 hearing.  Ex. U (transcript of evidentiary hearing on January 5, 2006).  He was at that time serving 48 months for perjury, to which he had pleaded no contest.  *Id.*, p. 59.  He stated that Gentry came to the jail to talk with him about testifying and getting a plea, and his main focus was trying to get a deal.  *Id.*, p. 60.  Bell was asked whether his attorney told him about getting preferred treatment if he gave a statement, at which point counsel for the state interrupted to say this was a new proceeding, and if Bell committed perjury he could be charged again.  *Id.*, p. 61.  The court advised Bell "you were sworn to tell the truth today so you need to tell the truth.  If you lie, that could be perjury."  *Id.*  It was indicated that the theory of prosecution for the earlier perjury was that he had made two different statements, "[s]o without ruling which one of them was a lie, one of them had to be a lie."  *Id.*, p. 62.  Mr. Greenberg (representing this Petitioner at his Rule 3.850 proceeding) argued that since, in his later statement, Bell said the earlier statements were false, his testimony in connection with Maurice Bell's Rule 3.850 proceeding "was arguably truthful."  *Id.*

There was a good deal of argument on the record as to whether Bell could be charged with perjury if he testified consistently with his testimony in Maurice Bell's postconviction proceeding. *Id.*, pp. 62-92. The court was initially inclined to order Bell to testify over his Fifth Amendment objection, as there had previously been no decision as to which testimony (that there was no deal, or that there was a specific deal) was a lie, that witnesses could not take the Fifth just because their testimony might not be believed. Instead, it was explained that if Bell testified that there had been a deal, he would be at risk of another perjury prosecution based not on his previous statements to the contrary under oath, but on evidence (such as testimony by his attorney and the prosecutor) showing this representation to be untrue. Given the dispute over which version of the facts was supposedly perjury, and the confusion regarding the charge and his plea to perjury, the court advised Bell that his Fifth Amendment right would be honored if invoked, and he invoked it. *Id.*, pp. 91-92.

Petitioner asked about this and the court explained, "it is very complicated. A roomful of lawyers can't figure it all out, I don't expect him to figure it out." *Id.* The same judge had presided over Maurice Bell's Rule 3.850 proceeding, had actually heard Alexander Bell's testimony, and had the transcripts. *Id.*, p. 96.

The written order denying relief to this Petitioner provided:

> Prior to the hearing, the 3.850 motion was allowed to be amended for defendant to claim the state used perjured testimony regarding the deal or lack of a deal for Alexander Bell. *The Court finds there was no deal.* Therefore, the use of perjured testimony at Ryland's trial has not been established. The Court denies this claim. For the purposes of considering the merits of this claim, the Court assumes that Alexander Bell, if he had testified again, would like to have repeated his testimony that he gave at Maurice Bell's 3.850 hearing which raised the identical ground, and over which this judge presided. Even giving the defense the benefit of this

presumption, the Court finds Mr. Poitinger's account of "no promised deals" most credible.

Ex. R, p. 480 (emphasis added).

The court found that there was no deal, and therefore the use of perjured testimony in Petitioner's trial was not established as a matter of fact. Petitioner has not shown this was an unreasonable determination of the facts in light of the evidence presented. He has not rebutted the presumption of correctness accorded this factual finding by clear and convincing evidence, or by any evidence at all. Having found no deal, there could be no showing that the prosecution knowingly introduced (or failed to correct) perjured testimony. *Cf.* Ventura v. Attorney General, Fla. 419 F.3d 1269, 1276-79 (11th Cir. 2005), collecting cases, including Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).[21] This was not contrary to or an unreasonable application of clearly established law.

**Ground Six, alleged conflict of interest of post-conviction counsel**

Petitioner claims that his post conviction counsel, Richard Greenberg, had a conflict of interest as he represented Petitioner's co defendant, Freddie Rowell, at trial. Doc. 7, pp. 6, 6c-6d (pp. 13, 16-17 in ECF). Petitioner asserts that his post-conviction

---

[21] Where a prosecutor knowingly introduces or allows perjured testimony, it is clearly established federal law that relief must be granted when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 419 F.3d at 1279, *quoting* Giglio. In Ventura, the witness testified that there were no promises and his only motive in testifying was to clear the air and tell the truth, written correspondence later showed this testimony to be false. *Id.*, at 1272-75. The Florida Supreme Court found that the prosecutor knowingly presented false evidence that there was no deal in exchange for the testimony, but that the evidence was not material; this finding was not contrary to or an unreasonable application of clearly established law. *Id.*, at 1276, 1281 (also noting that materiality "is a highly fact-dependent inquiry."). Here the state court found no deal and no perjury, so did not consider materiality.

argument was that trial counsel Holton was ineffective for failing to file a notice of

expiration of speedy trial time, and as Greenberg had not filed such a notice on behalf

of Rowell, if this Petitioner's Rule 3.850 claim had been successful, it would necessarily

have shown Greenberg was ineffective in representing Powell. *Id.*, p. 6d (p. 17 in ECF).

Petitioner raised this in the Rule 3.850 proceeding and a motion to withdraw was

denied, thus (he argues) he was denied the right to conflict free counsel, contrary to

clearly established law. *Id.*, pp. 6c-6d (pp. 16-17 in ECF).

Respondent asserts that the facts do not demonstrate a conflict of interest, and

that Petitioner had no Sixth Amendment right to post-conviction counsel. Doc. 15, pp.

26-29. Respondent also argues the claim is procedurally barred, and that it lacks merit.

*Id.*, pp. 29-33.

Petitioner is not entitled to relief on this claim. A defect in a collateral proceeding

is unrelated to the cause of detention, and does not state a claim for habeas corpus

relief. Quince v. Crosby, 360 F.3d 1259, 1261-62 (11th Cir. 2004),[22] *cert. denied*, 543

U.S. 960 (2004), *citing* Spradley v. Dugger, 825 F.2d 1566, 1568 (11th Cir. 1987) (other

citations omitted). *See also* In re Rutherford, 437 F.3d 1125, 1127 (11th Cir. 2006)

(citing Quince and Spradley). Moreover, ineffectiveness or incompetence of counsel

during a state post-conviction proceeding is not a ground for § 2254 relief. § 2254(i);

Henderson v. Haley, 353 F.3d 880, 892 (11th Cir. 2003) (there is no right to counsel in a

---

[22] Such an argument could be relevant to whether the presumption of correctness should apply to the state court proceedings, however. Quince, 360 F.3d at 1262 and n. 3 (citations and footnote omitted) (noting that no such argument had been raised there).

post conviction proceeding and therefore post conviction counsel cannot be ineffective,

this rule was codified in § 2254(i)) (collecting cases).

**Ground Seven, potential testimony at a Rule 3.850 hearing**

Petitioner asserts that Bell did not testify at his Rule 3.850 hearing because, due

to threats of perjury charges by the prosecutor and the court, Bell invoked his Fifth

Amendment.  Doc. 7, pp. 7-7b (pp. 18-20 in ECF).  Petitioner claims the prosecution

had no duty to warn Bell of a possible perjury prosecution, and this threat to Bell

"deprived Petitioner of vital testimony at his post conviction hearing."  *Id.*, p. 7b (p. 20 in

ECF).  Respondent claims that, at best, Petitioner has demonstrated harmless error, not

a due process violation.  Doc. 15, pp. 33-37.

A defect in the post conviction proceeding does not state a claim for § 2254

relief, as set forth above.  Petitioner is not in custody pursuant to that proceeding, but

pursuant to the judgment it attacked.  Moreover, as explained with respect to ground

five, this claim is unfounded on the facts.  The court had heard Bell's testimony at the

hearing for Maurice Bell, had the transcripts before it, and assumed he would have so

testified at Petitioner's hearing.

**Recommendation**

Accordingly, it is **RECOMMENDED** that Respondent's motion to dismiss (doc.

10) be **DENIED**, and that the 28 U.S.C. § 2254 petition for writ of habeas corpus filed by

Waty Ryland, challenging the judgment of the Second Judicial Circuit, Leon County,

case number R99-1192A, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on July 23, 2009.


s/     William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and
recommendations within 15 days after being served with a copy of this report and
recommendation. A party may respond to another party's objections within 10
days after being served with a copy thereof. Failure to file specific objections
limits the scope of review of proposed factual findings and recommendations.

Case No. 4:08cv53-MP/WCS